UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

D-1   BILLY ARNOLD,

    Defendant.
_____/

Case Nos. 15-cr-20652, 20-cr-20187

Hon. Sean F. Cox
United States District Court Judge

## OPINION & ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

The defendant in this criminal case moves for a judgment of acquittal on racketeering offenses stemming from his participation in a violent street gang called the Seven Mile Bloods, or "SMB." The defendant argues that the Government failed to prove that SMB was an enterprise engaged in, or whose activities affected, interstate commerce. The Court disagrees and denies the defendant's motion.

## BACKGROUND

Defendant Billy Arnold was indicted and tried for racketeering ("RICO") conspiracy, 18 U.S.C. § 1962(d); the commission of violent crimes in aid of racketeering ("VICAR") such as murder, attempted murder, and assault with a dangerous weapon, 18 U.S.C. § 1959; and various firearm-related sentencing enhancements. At the close of the Government's case following a five-week jury trial, Defendant made an oral motion for judgment of acquittal pursuant to Fed. R.

1

Crim. P. 29(a).  (ECF No. 1955-2 / ECF No. 106-2).[1]  The Court took Defendant's motion under advisement and permitted the parties to brief the issues that Defendant raised.

The parties stipulated to the elements of RICO Conspiracy and VICAR murder, attempted murder, and assault with a dangerous weapon.  Consistent with this stipulation, the Court instructed the jury that to find Defendant guilty of RICO Conspiracy and the charged VICAR offenses, they had to find that, *inter alia*, "[a]n enterprise, in this case the Seven Mile Bloods, existed" and "[t]he enterprise engaged in, or its activities affected, interstate commerce." (ECF No. 2020, *passim* / ECF No. 140, *passim*).  With respect to the enterprise element, the Court gave the following instruction:

> The government must prove an enterprise existed by evidence of an ongoing organization, formal or informal, and by evidence that the various associates functioned as a continuing unit.  The enterprise must have the three following structural features: (1) a common purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.
>
> It is not necessary that the enterprise have any particular or formal structure, but it must have sufficient organization that its members did or would function and operate in a coordinated manner in order to carry out the alleged common purpose or purposes of the enterprise.

(ECF No. 2020, PageID.30330–31 / ECF No. 140, PageID.5333–34) (incorporated in each substantive VICAR instruction).

On December 8, 2023, the jury returned a verdict convicting Defendant of twenty-two counts charged in the indictment.  (ECF No. 2016 / ECF No. 136).  Defendant's motion was fully briefed, and the Court heard oral argument on February 23, 2024.  For the following reasons, the Court denies Defendant's Motion for Judgment of Acquittal.

---

1. References to the electronic court docket list the docket entry in Case No. 15-cr-20652 followed by the docket entry in Case No. 20-cr-20187.

**STANDARD OF REVIEW**

To prevail on a motion for judgment of acquittal under Fed. R. Crim. P. 29, a defendant "bears a heavy burden." *United States v. Maliszewski,* 161 F.3d 992, 1005 (6th Cir. 1998). A defendant must show that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" when "view[ing] the evidence 'in the light most favorable to the prosecution.'" *United States v. Paulus*, 250 F.3d 267, 274 (quoting *United States v. Persaud,* 866 F.3d 371, 380 (6th Cir. 2017)). In reviewing a motion for judgment of acquittal, this Court "may neither weigh conflicting evidence nor assess the credibility of witnesses," *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984), including expert witnesses, *see Persaud*, 866 F.3d at 383.

**ANALYSIS**

Defendant argues that the Court must enter a judgment of acquittal on his RICO Conspiracy and VICAR convictions because the Government failed to present evidence from which any rational juror could have concluded: (1) that SMB was an enterprise; and (2) that SMB was engaged in, or its activities affected, interstate commerce. The Court disagrees.

**I.      Enterprise**

In arguing that the Government failed to prove that SMB was an enterprise, Defendant focuses on two parts of the Court's instruction: (1) that the members of an alleged enterprise must share a purpose that their participation in the enterprise is designed to carry out, and (2) that there must be relationships among those associated with the enterprise. Here, the Government's evidence showed that members of SMB shared the common purpose of selling drugs and retaliating against rival gangs. The same evidence also established that the requisite

3

relationships existed among SMB members. A rational jury could have found beyond a reasonable doubt that SMB was an enterprise.

### A. Common Purpose of Drug Dealing

Cooperating witnesses Anthony Lovejoy and Derrick Kennedy explained the history and structure of SMB. The group started in the early 2000s as a Blood gang operating on Detroit's east side, in an area known as the Red Zone. SMB descended from an older gang and its members identified with the color red. A subgroup of SMB was known as 55, which consisted primarily of high-end drug dealers including Lovejoy, Kennedy, Quincy Graham, and Michael Rodgers. SMB members used social media posts, hand signs, and tattoos to identify their gang affiliation. (ECF No. 2000, PageID.29371–73 / ECF No. 129, PageID.4795–97). In recorded jail calls, Defendant described himself as the CEO and founder of SMB and declared that he would be a Seven Mile Blood "till the day I die." (Gov't's Trial Ex. 50.40).

SMB's purpose of promoting and enhancing its members' and associates' drug dealing activities was described in detail by Lovejoy and Kennedy. SMB members initially sold drugs in the Red Zone to the exclusion of rival gangs. Lovejoy explained that he felt safe selling drugs in the Red Zone because of SMB's reputation. (ECF No. 2000, PageID.29458–59 / ECF No. 129, PageID.4882–83).

Eventually, SMB's drug dealing moved from cocaine and marijuana in Detroit to oxycontin pills in West Virginia because selling prescription pills was far more lucrative. At times some SMB members worked together to sell pills. For example, Jason Gill supplied Lovejoy with pills to sell in West Virginia, which were transported from Detroit to West Virginia by Arlandis Shy. Lovejoy estimated that he made $6,000 a day, which he split with Gill. (ECF No. 2000, PageID.29496–97, 29511 / ECF No. 129, PageID.4920–21).

4

If a member or associate of SMB wanted to start selling pills, they would stay with other SMBs who had houses or apartments in West Virginia. SMB members used other members to bring pills to West Virginia and take the proceeds back to Detroit. Lovejoy testified that SMB member Devon McClure was paid to guard the money in West Virginia. (ECF No. 2000, PageID.29475 / ECF No. 129, PageID.4899).

Kennedy testified that co-defendant Jerome Gooch sold pills for other SMB members. (ECF No. 2012, PageID.29965 / ECF No. 133, PageID.4984). Kennedy described it as a "team effort" and said there was unlimited demand and never enough pills, "so, it's not really a competition, just help each other out because we was friends." *Id*.

While Defendant was in the custody of the Michigan Department of Corrections from 2007 until 2013, he kept tabs on SMB's drug business. The testimony of Kennedy and Lovejoy, as well as prison calls, describe that SMB members put money, which consisted entirely of drug proceeds, on Defendant's prison account. When Defendant was released, SMB members helped him get on his feet by giving him cash and designer clothes that had been purchased with drug proceeds. (ECF No. 2001, PageID.29547 / N/A; ECF No. 2012, PageID.29966 / ECF No. 133, PageID.4985).

Following his release from prison, Defendant began selling prescription drugs in West Virginia. Jail calls demonstrate that initially other SMB members sold pills for Defendant because he was on a tether and could not leave Michigan. (Gov't's Trial Ex. 46.1). Once his tether was removed, Defendant travelled to West Virginia, staying at times with Kennedy, who assisted him with selling pills. (ECF No. 2012, PageID.29964-65 / ECF No. 133, PageID.4983-84).

Evidence introduced through law enforcement witnesses showed that SMB members and associates were found together when they were arrested, both in Detroit and in West Virginia. In most instances, the SMB members and associates were found with drugs or guns, or both. A rational jury could have found beyond a reasonable doubt that SMB members and associates worked together, shared information, and pooled resources for the common purpose of selling drugs.

### B. Common Purpose of Confronting and Retaliating Against Rival Gangs

In addition to introducing evidence that SMB members sold drugs, the Government introduced evidence that SMB members had the common purpose of confronting and retaliating against rival gangs using intimidation, threats, and violence. There was clear evidence that a gang war between SMB and the Hustle Boys reignited after Defendant was released from prison. Kennedy described an incident in the spring of 2014 at Somerset Mall in Troy, Michigan, when he and Defendant ran into members of the Hustle Boys. Defendant tried to start a fight with Hustle Boy members Michael Davis, Martez Davis, and Darnell Canady. Kennedy testified that he "was trying to get [Defendant] out the situation" because Defendant was on parole and the police in Troy would take him to jail. (ECF No. 2012, PageID.29995 / ECF No. 133, PageID.5014).

A short time later, on July 14, 2014, Defendant had a meeting at a parole office at the same time as Michael Davis and Martez Davis. When Defendant's parole appointment ended, he called Corey Bailey. Cell tower evidence and phone records showed that Bailey then came to the parole office. Defendant and Bailey were in the vicinity when a vehicle containing rival gang members was shot up, resulting in the death of Djuan Page and the non-fatal shooting of Michael Davis.

Ballistics and co-conspirator testimony tied Defendant and Bailey to the shootings. Kennedy testified that the rival gang had posted his picture on social media, as well as pictures of other SMB members, with captions saying that the rivals were going to kill them because Corey Bailey killed Djuan Page. Kennedy explained, "they didn't even know that [Defendant] was the one that shot them because after the shooting happened—they were ducking, and when they looked up they seen [Bailey] hanging out the window with a red flag." (ECF No. 2012, PageID.30000 / ECF No. 133, PageID.5019).

A pivotal event that escalated the gang war was the killing of SMB member Devon McClure on May 1, 2015. Over the course of twelve trial days, the Government presented evidence that Defendant sought revenge by hunting for rival gang members and participating in targeted shootings on May 1, May 8, May 10, and June 7 of 2015. FBI Special Agent Vincente Ruiz introduced text messages and videos taken from SMB members' phones that were related to the shootings. Law enforcement officers testified about their investigations of the shooting scenes. Cooperating witnesses Kennedy and Matleah Scott testified about the gang war and the actions taken by Defendant in retribution for McClure's death. The jury heard about the shootings from eyewitnesses, including lay people and rival gang members.

Special Agent Neil Gavin, a member of the FBI's Cellular Analyst Security Team, described how cellular data records identify cell tower connections, which can be used to determine the general location of a mobile device at specific points in time. Gavin used such records to compare the location of SMB members to the time and location of known crimes.

Michigan State Police forensics expert Rebecca Smith connected cartridge casings found at crime scenes to specific firearms by firing test shots and comparing the tool marks. She testified that the .223 Bushmaster rifle recovered September 26, 2015, from Steven Arthur's car,

7

in which Defendant was a passenger, was used to shoot Raphael Carter on May 1, 2015; kill Dvante Roberts and shoot Marquis Wicker on May 8, 2015; and shoot at Darnell Canady, Jason Gaskin and Derrick Peterson on May 10, 2015.  Smith also testified that the .40 caliber casings found at the scenes of the May 10 and June 7, 2015, shootings, had been fired from the same firearm.  Each of these shooting incidents also involved other SMB members or associates.

A rational jury could have found beyond a reasonable doubt that that SMB members and associates had relationships and shared the common purpose of confronting and retaliating against rival gangs.

## II.     Interstate Commerce

Defendant additionally argues that, at best, the Government proved that individuals crossed state lines to sell drugs for their own individual gain.  However, as discussed above, the Government introduced evidence from which a rational jury could have found beyond a reasonable doubt that the activities of SMB involved interstate drug dealing, which affected interstate commerce.

## CONCLUSION & ORDER

Defendant fails to show that no rational jury could have found beyond a reasonable doubt that SMB was an enterprise engaged in, or whose activities affected, interstate commerce.  Accordingly, **IT IS ORDERED** that Defendant Billy Arnold's Motion for Judgment of Acquittal is **DENIED**.

**IT IS SO ORDERED.**

s/Sean F. Cox  
Sean F. Cox  
United States District Judge

Dated:  March 4, 2024